United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

Ray Hrdlicka; Crime, Justice & America, Inc., a California Corporation,

Plaintiffs,

v.

Bill Cogbill, in his official capacity of Sheriff of the County of Sonoma,

Defendant.
_______________________________________/

No. C 04-3020 MJJ

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Pending before the Court are: (1) Plaintiffs Ray Hrdlicka and Crime, Justice & America, Inc.'s ("CJA, Inc.") Motion for Summary Judgment (Doc. #60); and (2) Defendant Sonoma County Sheriff Bill Cogbill's Cross-Motion for Summary Judgment (Doc. #68).[1] For the following reasons, the Court **GRANTS** summary judgment in favor of Defendant.

## I. FACTUAL AND PROCEDURAL HISTORY

Except as otherwise indicated, the following facts taken from the parties' Joint Statement of Facts (Doc. #85, ("SOF")), briefs, and supporting declarations are undisputed.

Mr. Hrdlicka is the sole shareholder, controller, manager, and editor of *Crime, Justice & America* ("*CJA*"), an approximately forty-page magazine, published quarterly, dedicated to discussing issues in the American criminal justice system. (SOF ¶¶1, 3.) Approximately 70-85% of the content of each issue of *CJA* is editorial in nature and includes articles authored by legal and law enforcement

[1]The Department of Insurance has submitted an letter-brief *amicus curiae*, to which Plaintiffs filed a Reply Memorandum. (*See* Docs. ## 87, 91.)

professionals on various criminal justice issues. (*Id*., ¶4.) The remaining content, approximately 5-8 pages, consists of advertisements for the services of bail bonds agents and criminal defense attorneys, as well as *CJA*'s solicitations for such advertising and ads promoting the magazine, itself. (*Id*., ¶¶5-6; Doc. #76, Second Hrdlicka Decl. ¶7.) The advertising is region-specific, and varies with each edition.[2] (*Id.* ¶3.) *CJA* also contains a $300 rebate check, which a reader may use toward the services of bail bondsmen and defense attorneys.[3] (SOF ¶24.)

*CJA*'s target audience is county jail inmates. (*Id*., ¶7) The magazine is provided free of charge to inmates in certain county jails in California.[4] (*Id*.; Hrdlicka Decl. ¶59.) CJA Inc. distributes the magazine to inmates in county jails through one of two methods: the direct mail method or the bulk distribution method. (Hrdlicka Decl. ¶23.) Under the direct mail method, CJA, Inc. addresses each copy of the magazine to an individual inmate and sends the magazine to that inmate by U.S. mail. (Hrdlicka Decl. ¶25.) Alternatively, under the bulk distribution method, CJA, Inc. delivers one or more boxes containing 100 issues of the magazine to the jail facility and the jail staff place a number of copies in each jail's day room or common area and then replenishes the magazine supply as it runs out.[5]

---

[2] For example, the edition at issue in this case is the June 2004 Marin/Sonoma edition which contains advertisements for bail bond agents and attorneys in Marin and Sonoma counties.

[3] In his Declaration, Mr. Hrdlicka states: "Prior to the June 2004 issue of [*CJA*], issues of the magazine contained a $300 'rebate check' payable to bail bondsmen who advertised in *CJA*. However, in response to objections from several sheriffs, CJA, Inc. has since ceased printing rebate checks in [*CJA*] as of the June 2004 issue." (Doc. #64, Hrdlicka Decl. ¶70.) However, as detailed above, in the parties' Joint Statement of Facts, the parties indicate that *CJA* still contains the rebate checks.

[4] The parties dispute the number of jails in which *CJA* is distributed. Specifically, Plaintiffs claim that as many as 33 county jails distribute the magazine. (*See* Doc. #76, Hrdlicka Sec. Decl. ¶19.) Although Defendant does not proffer a contrary number, it contends that the number of facilities distributing *CJA* is less than 30. (*See* Doc. #90.)

[5] In its April 13, 2005 Order denying Plaintiffs' motion for a preliminary injunction, the Court inaccurately defined bulk delivery as mailing, *en masse*, unaddressed copies of *CJA* to the jail for the jail's mailroom staff to distribute to each inmate's mailbox after inspection. The Court's understanding of how the bulk delivery method works has been clarified by the parties' current briefing. Particularly, in his Declaration, Mr. Hrdlicka offers the following descriptions of the two methods.

> 24. CJA, Inc. uses the term "bulk distribution" to describe the practice in which [*CJA*] is sent into the county jails on a weekly basis in one or more boxes of 100 issues each. The magazines are not individually addressed. Copies of the magazine are then placed as stacks in jail common areas that inmates will frequent when they are not in their cells (such as day rooms, medical units, pods, and modules), as deemed most appropriate by jail staff, so that all inmates over the course of the week have access to a copy of the

United States District Court
For the Northern District of California

(Hrdlicka Decl. ¶24.) CJA, Inc.'s preferred method of distributing the magazine is the bulk distribution method. (Hrdlicka Decl. ¶29.) At the time Plaintiffs filed their Motion, 25 county jails accepted the magazine via the bulk distribution method, and 7 county jails accepted the magazine via the direct mail method (Sec. Hrdlicka Decl. ¶19). Jails in Contra Costa, Butte, Sacramento, and Sonoma counties have refused CJA, Inc.'s request to distribute *CJA* under either method.

Sonoma County Sheriff Bill Cogbill operates two detention facilities in Sonoma County: the Main Adult Detention Facility ("MADF"), which primarily houses pre-trial inmates; and the North County Detention Facility ("NCDF"), which primarily houses inmates who have been convicted and sentenced. (SOF ¶¶8-9.)

On February 16, 2004, Plaintiffs sent a letter to Assistant Sheriff Michael Costa[6] requesting that the jail distribute *CJA* to inmates at the Sonoma County jails and attaching several issues of *CJA* for his review. (SOF ¶10.) Alternatively, Plaintiffs requested that the Sheriff's Department respond to a Public Records Act request and provide names, booking numbers, and booking dates of all inmates in custody, and that the Sheriff's Department send this information to Plaintiffs electronically each Monday so that Plaintiffs could mail copies of *CJA* directly to inmates at the Sonoma County jails.[7] (*Id.*) On March 17, 2004, Deputy County Counsel, Anne Keck, notified Mr. Hrdlicka by letter that the Sheriff's Department was denying Plaintiffs' requests on the ground that the magazine was "unsuitable for distribution in Sonoma County jail facilities, whether by internal distribution or direct subscription." (Keck Decl., Ex.

---

most recent issue. Jail staff determine both the specific location of the stacks and the number of magazines to set out at any one time, usually after discussions with CJA, Inc. Regarding the methods used in other counties, and distribution ratios of 4-5:1 of inmates to magazines. Jail staff may choose to distribute all copies received from CJA, Inc., at once, or distribute smaller amounts and replenish the stacks are they are depleted.

25. CJA, Inc. Uses the term "direct mail" to describe distribution in which CJA, Inc., individually addresses magazines to inmates and mails them individually to inmates via the United States Postal Service.

(Doc. #64 at 5-6.)

[6]Assistant Sheriff Costa is responsible for the administration and management of the Sonoma County jails. (Doc. #70, Costa Decl. at 1.)

[7] Through exemptions provided under the Public Records Act as well as negotiations of the parties, beginning on July 28, 2004, Plaintiffs were electronically provided with the names, booking numbers, and bail amounts of certain categories of inmates at the Sonoma County jails.

**United States District Court**
For the Northern District of California

B at 1; SOF ¶11.) Specifically, the letter indicated that based on the Sheriff's Department's "review of the magazines [] provided with [the] letter, the content of the magazines [are] designed to evoke emotional/physical responses such that it would adversely affect the safety and security of [the County's] facilities."[8] (*Id.*)

Subsequently, on May 8, 2004, Plaintiffs contacted counsel for Sonoma County electronically, and asked that the Sheriff's Department review a draft of the May 2004 Marin/Sonoma edition of *CJA* and assist in editing or critiquing the articles to make sure that they did not raise safety or security concerns. (SOF ¶12.) In a letter dated May 14, 2004, Ms. Keck informed Plaintiffs that the Sheriff's Department determined that the magazine was "inappropriate for distribution to inmates in the Sonoma County Jail based on the advertisements and the attorney retainer/bail bondsman premium checks" in the magazine. (Keck Decl., Ex. E.) Specifically, she explained that "[i]f disseminated in the jail, the advertisements would violate the prohibitions against bail bond and attorney solicitations in a county jail contained in Title 10 of the California Code of Regulations, Section 2074 (unlawful bail bond solicitation) and Business and Professions Code Section 6152 (unlawfully soliciting business for an attorney in a county jail)." (*Id.*) Additionally, Ms. Keck indicated that dissemination of the rebate checks would violate the unlawful solicitation provisions, as well as Title 10 of the California Code of Regulations Section 2078, which prohibits bail licensees from offering gifts or rebates to inmates. (*Id.*)

On May 17, 2004, CJA, Inc. sent Ms. Keck a letter challenging the legal bases Ms. Keck had cited supporting the Sheriff's decision to refuse delivery of *CJA*. (Keck Decl., Ex. G.) By letter dated June 11, 2004, Ms. Keck clarified the Sheriff's position with respect to delivery of *CJA*. Ms. Keck indicated that the only decision the Sheriff had made was that "the jail would not voluntarily distribute the magazine to jail inmates outside normal mail processes." (Keck Decl., Ex. I.) Additionally, Ms. Keck stated that, "if the magazine were to be directly mailed to county jail inmates, jail staff would follow Sheriff's Department well-established policies regarding review and dissemination (that are fully compliant with Penal Code section 2601(c) and other applicable case law) of each magazine on a case-by-case basis." (*Id.*) Ms. Keck explained that, "[t]o date, [*CJA*] ha[d] not gone through this process -

[8] Additionally, the Sheriff's Department denied Plaintiffs' Public Records Act request because it did not comply with the Department's policy requiring separate request for each Public Records Act request made. (*Id.*)

United States District Court
For the Northern District of California

nor ha[d] distribution been refused - because [*CJA*] simply ha[d] not been mailed to any Sonoma County jail inmate." (*Id.*)

Thereafter, on June 30 2004, Plaintiffs sent to the MADF facility via bulk mail 300 individually-addressed, looseleaf copies of the June 2004 Marin/Sonoma edition of *CJA*.[9] (SOF ¶17.) Shortly thereafter, the Sheriff's Department notified Plaintiffs that the copies of *CJA* were "Disapproved Mail" under the Sheriff's Inmate Mail Policy, and would not be delivered. (SOF ¶20; Doc. #70, Michael Costa Declaration ¶9.) Specifically, the Sheriff's Department indicated that, based on the bail bond and attorney advertisements in the June 2004 issue of *CJA*, the publication was proscribed under the Inmate Mail Policy as "unsolicited commercial mail," "business mail," and "illegal materials."[10] Concomitantly, Defendant distributed a Notice of Disapproved Mail to every MADF inmate informing them that they may have received a copy of *CJA* in the mail, and that the jail staff had placed such copies with the inmate's property to be given to the inmate upon release from jail. (SOF ¶23.)

On July 26, 2004, Mr. Hrdlicka filed a Complaint seeking a declaratory judgment requiring Sheriff Cogbill to deliver *CJA* to MADF inmates. (SOF ¶1; Doc. #1.) He also sought a temporary

---

[9] As described by the parties in their Joint Statement of Facts, the 300 copies were "individually addressed to specific inmates" <u>and</u> "sent by bulk mail."

[10] The Policy defines "Unsolicited Commercial Mail," "Business Mail," and "Illegal Materials" as follows:

> **Unsolicited Commercial Mail**:
> Mail that is not expressly ordered and paid for and that includes advertisements for the sale of goods or services, including but not limited to: advertising fliers/circulars, mass mailed solicitations, catalogues, credit card applications, real estate brochures, periodical subscription cards, and other mail soliciting the sale of goods or services and based on the promise to pay upon receipt.
>
> . . . .
>
> **Business Mail**: Inmates are prohibited from operating any business from the facility. Accordingly, incoming or outgoing correspondence that relates to or involves the transaction of some business (*e.g.*, ordering goods or services, periodical subscription cards based on promises to pay later) as opposed to personal correspondence will not be mailed out nor delivered to inmates.
>
> . . . .
>
> **Illegal Materials**: Any material the possession or transfer of which is illegal under any state or federal law shall be prohibited from being introduced into the Facility.

United States District Court
For the Northern District of California

restraining order ("TRO") and a preliminary injunction compelling Sheriff Cogbill to deliver copies of *CJA* to inmates at the Sonoma County jails. (Doc. #2.) The Court denied the motion for a TRO on July 29, 2004.[11] (Docs. #11, #14.) On April 13, 2005, the Court denied Plaintiffs' motion for a preliminary injunction, finding that Plaintiffs had not demonstrated a likelihood of success on the merits. (Doc. #51.) The parties now bring cross-motions for summary judgment.

In their Motion, Plaintiffs seek a judgment finding that Sheriff Cogbill's refusal to distribute *CJA* in Sonoma County jails violates Plaintiffs' First Amendment rights. Defendant, however, maintains that whatever First Amendment right Plaintiffs may have in this context does not extend to permit them to distribute unsolicited mail to inmates housed in the County jail facilities. Defendant therefore seeks a judgment finding his denial of Plaintiffs' request to distribute the magazine constitutional.

## II. LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247-48. An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute might affect the case's outcome. *Id.* at 248. Factual disputes are genuine if they "properly can be resolved in favor of either party." *Id.* at 250. Thus, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence

---

[11] Subsequently, Plaintiffs filed an Amended Complaint adding CJA, Inc., Terry Ridout and Raul Pablo as Plaintiffs, and adding class allegations. Pursuant to a Stipulated Order, the Court subsequently dismissed Rideout and Pablo from the case and Plaintiffs have withdrawn their class allegations. Plaintiffs Hrdlicka and CJA, Inc. are the only remaining Plaintiffs.

in the light most favorable to that party, could resolve the material issue in his or her favor. *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

**III. DISCUSSION**

In this matter, Plaintiffs contend that, as a matter of law, they have a First Amendment right to distribute their magazine to inmates at the MADF facility, subject to the legitimate penological objectives of the corrections system. They assert that Defendant's refusal to deliver or otherwise make available copies of *CJA* to Sonoma County inmates is an unconstitutional restriction of their right to free speech. In particular, Plaintiffs argue that Defendant's refusal to distribute *CJA* is not rationally related to any of his proffered penological objectives.

Defendant, in contrast, maintains that Plaintiffs have no First Amendment right to distribute their unsolicited magazine to inmates in the Sonoma County jails. Defendant further argues that even if Plaintiffs do have such a right, his refusal to deliver *CJA* to Sonoma County inmates is rationally related to the jails' legitimate penological interests.

Based on these competing arguments, the threshold issue the Court must address is whether Plaintiffs have a First Amendment right to distribute their unsolicited magazine to inmates. If Plaintiffs do have such a right, the question becomes whether Defendant's refusal to accept delivery of Plaintiffs' magazine is rationally related to a legitimate penological objective.

**A. The Nature of Plaintiffs' First Amendment Right**

It is settled law that "[i]n a prison context, an inmate . . . retain[s] those First Amendment rights that are [not] 'inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" *Jones v. N. Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129 (1977) (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). More specifically, for purposes of this matter, the Supreme Court has recognized that "there is no question that publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989). However, this right is not unlimited, but "is subject to substantial limitations and restrictions in order to allow prison officials to achieve legitimate correctional goals and maintain institutional security."

*Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005). In order for a regulation affecting a publisher's or prisoner's First Amendment right to be constitutional, it must be "reasonably related to legitimate penological interests." *Turner v. Safely*, 482 U.S. 78, 89-90 (1987).[12] As a preliminary matter, before the Court can engage in a *Turner* analysis in this case, it must first ascertain the nature and scope of the purported First Amendment interest that Plaintiffs claim is being infringed upon by Defendant's refusal to deliver *CJA*.

Following the Supreme Court's decision in *Thornburgh*, the Ninth Circuit has consistently recognized the general principle that "[p]ublishers have a First Amendment right to communicate with prisoners by mail, and inmates have a First Amendment right to receive this mail." *Lehman*, 397 F.3d at 699; *see also Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001) (citing *Thornburgh*, 490 U.S. at 408). The pivotal question raised in this case is whether the First Amendment right publishers possess is broad enough to encompass Plaintiffs' attempt to distribute a free, unsolicited magazine to Sonoma County jail inmates by either directly mailing the magazine to individual inmates or mailing the magazine in bulk to the prison facilities for placement in inmate common areas. As Defendant correctly points out, there is no Supreme Court or Ninth Circuit authority directly addressing this scenario.

The leading Ninth Circuit cases evaluating the constitutionality of prison mail regulations affecting publications are *Prison Legal News v. Cook*; *Morrison v. Hall*, 261 F.3d 896 (9th Cir. 2001); and *Prison Legal News v. Lehman*. A review of the facts of each of these decisions, and the factors the Ninth Circuit considered in assessing the strength of the First Amendment interest and the constitutionality of the regulation impinging on such interest, provides this Court with some guidance for ascertaining the nature and scope of Plaintiffs' purported First Amendment interest in the instant matter.

In *Cook*, the plaintiffs - Prison Legal News ("PLN") and three prisoners - challenged an Oregon Department of Corrections' policy prohibiting receipt of standard rate/bulk mail. 238 F.3d at 1148. PLN published a non-profit newsletter about prison-related issues and qualified to use postal Standard

[12] As explained in greater detail in Section B of this Order, *Turner* sets forth four factors that the Court must consider when assessing whether a prison regulation affecting First Amendment rights passes constitutional muster.

United States District Court
For the Northern District of California

A "non-profit organization rates" to mail its newsletter. *Id*. Approximately 15 Oregon state prisoners - including two of the named plaintiffs - subscribed to the newsletter, but were prevented from receiving it solely because PLN mailed it under the Standard A postage rate.[13] *Id*. PLN and the prisoners challenged the ban on the ground that it impermissibly infringed on their First Amendment rights. The district court granted summary judgment in favor of the defendant prison officials on the plaintiffs' § 1983 claim, and the plaintiffs appealed. *Id*. at 1146. On appeal, the Ninth Circuit began its analysis by noting that in *Thornburgh*, the United States Supreme Court held that "publishers who wish to communicate with inmates by sending requested subscriptions have a 'legitimate First Amendment interest in access to prisoners.'" *Id*. at 1149. The Ninth Circuit then rejected the defendants' argument that the regulation did not implicate PLN and the prisoners' First Amendment rights because it only resulted in the loss of cost advantages - namely, PLN's ability to use the non-profit organization postage rate. *Id*. Instead, the court found that "although . . . the Department regulation mainly affects economic interests, it is also clear that the regulation implicates both [PLN's] and [the prisoners'] First Amendment rights." *Id*. Particularly, the court noted that the speech at issue was core protected speech, not commercial speech or speech that raised security concerns or implicated penological interests, and that paying a higher postage rate was not a feasible alternative for PLN. *Id*. After finding that the policy implicated the plaintiffs' First Amendment rights, the court analyzed the policy under the first factor of the *Turner* test.[14] It concluded that tying the receipt of subscription non-profit newsletters to postal service rate classifications was not rationally related to any legitimate penological interest proffered by the prison officials, rendering the regulation unconstitutional as applied to such mail. *Id*. at 1149-50.

After assessing the constitutionality of the policy, the court addressed the plaintiffs' appeal of the trial court's grant of qualified immunity to the Department's officials for their act of banning PLN's newsletter pursuant to the regulation. *Id*. at 1152. After reviewing *Sheets v. Moore*, 97 F.3d 164 (6th Cir. 1996), wherein the Sixth Circuit upheld a regulation prohibiting "[f]ree advertising material, fliers,

---

[13]More specifically, one of the inmate-plaintiffs was a paid subscriber to PLN's newsletter, and the other inmate-plaintiff tried to subscribe to the newsletter but was informed by PLN that it could not honor his request because of the Department's prohibition against standard mail.

[14]In undertaking the *Turner* analysis, the court noted that "[t]he same analysis applies to regulations affecting *publishers*' right to send materials to prisoners." *Id*. at 1149 (citing *Thornburgh*, 490 U.S. at 413.).

and other bulk rate mail," *Miniken v. Walter*, 978 F. Supp. 1356 (E.D. Wash. 1997), in which the district court struck down a ban on bulk mail as applied to subscription non-profit organization mail, and two unpublished Oregon district court decisions upholding the Department's policy, the Ninth Circuit held that "[b]ecause the 'contours' of [PLN's] right to send and [the prisoners'] right to receive subscription non-profit organization standard mail were not sufficiently clear that a reasonable official would understand what he was doing violated that right, the law in this case was not clearly established." *Id*. (internal citations and quotations omitted). Accordingly, the court held that the Departments' officials were entitled to qualified immunity.

Six months after *Cook*, the Ninth Circuit issued its decision in *Morrison*, wherein the court again assessed the constitutionality of the Oregon Department of Corrections Department's policy prohibiting bulk rate mail, this time as it applied to pre-paid, for-profit subscription publications. 261 F.3d at 897. In *Morrison*, the plaintiff-inmate brought a § 1983 claim after prison officials returned an issue of *Montana Outdoors* magazine - a for-profit publication mailed bulk rate to which the plaintiff had a paid subscription. *Id*. at 900. After reviewing the decision in *Cook*, the court evaluated the regulation under *Turner*. The court noted that the prison officials had proffered the same general penological interests in support of the regulation that they proffered in *Cook*, and found that, as in that case, the defendants had failed to demonstrate that the regulation banning incoming mail based on postage rate was rationally related to a legitimate and neutral governmental objective. *Id*. at 902. Particularly, the court rejected the contention that "there is any legally significant distinction between the subscription *non-profit* publications at issue in [*Cook*], and the subscription *for-profit* publications at issue" in *Morrison*. *Id*. at 904. The court therefore held that the regulation unconstitutionally burdened the plaintiff's First Amendment rights.

Four years after *Morrison*, the Ninth Circuit issued its decision in *Lehman*. In that case, PLN sought to distribute a non-subscription (*i.e.*, free) monthly magazine to certain inmates in the Washington state correctional facility who had requested the magazine. 397 F.3d at 695. The Washington Department of Corrections, however, banned the magazine, citing a policy directive prohibiting inmates from receiving non-subscription bulk mail and catalogs. The district court granted summary judgment in PLN's favor, finding the policy directive violated PLN's First Amendment rights.

*Id*. at 697. On appeal, the Ninth Circuit first reviewed its prior holdings in *Cook* and *Morrison*, and noted that unlike those cases, the *Lehman* matter "squarely presented . . . the question [] whether a ban on non-subscription bulk mail and catalogs is also unconstitutional." *Id*. at 699. Again acknowledging that "[p]ublishers have a First Amendment right to communicate with prisoners by mail, and inmates have a First Amendment right to receive this mail," the Ninth Circuit turned to the *Turner* analysis to determine whether the policy was reasonably related to a legitimate penological interest. *Id*. at 699. As with its prior decisions in *Cook* and *Morrison*, the Ninth Circuit found that the Department had failed to satisfy the first *Turner* prong by demonstrating that the ban on non-subscription bulk mail was rationally related to a neutral government objective. *Id*. at 699-700. The Ninth Circuit therefore affirmed the trial court's ruling that the ban was unconstitutional.

Although the Ninth Circuit held that the first *Turner* prong was dispositive, it went on to present a detailed explanation reconciling its decision with its prior prison mail cases. Specifically, the court reasoned:

> It should be noted that PLN was not sending mail to Washington's correctional facilities to be distributed to all inmates, regardless of whether they had expressed interest in receiving it. This case is therefore distinguishable from *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119 [] (1977), in which the Supreme Court upheld a ban on junk mail sent indiscriminately to all inmates. In *Jones*, the inmates were permitted to receive mail that was sent to them individually. *Id*. at 131 n.8 []. In this case, every piece of mail sent by PLN is sent as a result of a request by the recipient, but the inmates were not allowed to receive it.
>
> The only way to distinguish this case from *Morrison* and [*Cook*] is that the inmates in this case did not pay for the mail that was sent to them. But it is the fact that a request was made by the recipient, and not the fact that the recipient is paying to receive the publication that is important. As a Washington district court explained in one of the previous cases brought by PLN against the DOC, "[t]he sender's interest in communicating the ideas in the publication corresponds to the recipient's interest in reader what the send has to say . . . We can perceive no principled basis for distinguishing publications specifically ordered by a prison inmate from letters written to that inmate for purposes of first amendment protection . . [.]" *Miniken v. Walter*, 978 F. Supp. 1356, 1362 (W.D. Wash. 1997) (quoting *Brooks v. Seiter*, 779 F.2d 1177, 1180 (6th Cir. 1985)). Although the *Miniken* case involved a subscription publication, it indicates that it is the request on the part of the receiver and compliance on the part of the sender, and not the payment of money, that is relevant to the First Amendment analysis.
>
> This case is not a scenario in which a publisher has attempted to flood a facility with publications sent to all inmates, regardless of

United States District Court
For the Northern District of California

> whether they requested the publication. In fact, PLN submitted evidence that at one of the correctional facilities, the mailroom received an average of only thirty-one catalogs and non-subscription bulk rate mail per day. PLN argues persuasively that this amount is virtually indistinguishable from the fifteen to thirty pieces of mail that were prohibited by the ban at issue in [*Cook*], an amount which we held was "minimal." [*Cook*], 238 F.3d at 1151.

*Id.* at 700-701.

While the foregoing discussion did not constitute part of the court's holding, the discussion sheds light on the factors the Ninth Circuit considers in demarcating the parameters of First Amendment protection afforded to mail in the in the prison setting. Like the publication at issue in *Lehman*, Plaintiffs seek to distribute *CJA* to inmates in the Sonoma County jails free of charge - a fact which distinguishes the instant matter from *Cook* and *Morrison*, where the inmates were paid subscribers to the banned publications. However, as the Ninth Circuit's discussion detailed above indicates, this fact is not accorded much significance in the First Amendment analysis. *See id.* at 700. Instead, the critical fact that differentiates the instant case from *Jones*, *Cook*, *Morrison*, and *Lehman*, is that Plaintiffs here do not seek to send *CJA* only to inmates who have previously requested to receive the magazine. Thus, the convergence of the publisher's interest in sending its publication to an inmate, and the inmate's express willingness to receive that publication is absent in this case. Based on the Ninth Circuit's *dicta* in *Lehman*, this fact is both "important" and "relevant" to the First Amendment analysis of regulations affecting mail from publishers to prisoners. The question left unresolved by the Ninth Circuit's language in *Lehman*, however, is to what extent does this shared interest in communicating affect the scope of First Amendment protection afforded to publishers and prisoners to communicate via mail.[15]

---

[15]Looking outside the Ninth Circuit, the only decision dealing with unsolicited bulk mail in the prison setting is the Sixth Circuit's decision in *Sheets*. In that matter, a state prisoner brought a § 1983 claim challenging the constitutionality of a Michigan Department of Corrections policy directive prohibiting free advertising, fliers, and other bulk mail, after the jail facility rejected a catalog and order form sent to him while in jail. *Id.*, 97 F.3d at 165. The district court granted summary judgment in favor of the plaintiff, finding that the defendant failed to articulate a legitimate penological purpose supporting the rejection of free advertising materials to plaintiff. The district court also denied the defendant-correctional official's qualified immunity defense on the ground that plaintiff's right to receive such mail was clearly established.

On appeal, the Sixth Circuit first addressed the defendant's qualified immunity argument. The court noted that, at the time of the appeal, there was no Supreme Court or appellate decisions directly addressing a prisoner's right to receive non-subscription, bulk rate mail. *Id.* at 166. After surveying the Supreme Court and Sixth Circuit decisions regarding mail in the prison setting, including a prior Sixth Circuit decision holding that prison officials could not withhold personal subscription

Further, the instant matter is also distinguishable from Ninth Circuit precedent based on the distribution methods Plaintiffs seek to utilize to deliver *CJA* to the Sonoma County inmates. The publishers in *Cook*, *Morrison*, and *Lehman* each sent their publications as bulk postage rate mail only to the specific prisoners who requested the publications. Here, in contrast, Plaintiffs seek to distribute their magazine to the Sonoma jails either via the "bulk distribution method", which entails mailing one or more boxes containing 100 issues of the magazine, or by direct mail specifically addressed to individual inmates housed in the Sonoma facilities. Thus, unlike prior decisions which evaluated the affect of prison regulations on a publisher's ability to use a specific postage rate and whether regulation of mail based on that postage rate classification was rationally related to a legitimate penological interest, the "bulk mail" issue in this case concerns the quantity of the publication Plaintiffs seek to mail to the detention facilities and the manner in which those issues arrive, *i.e.*, whether in incremental bulk-issue shipments or via individual mailings to numerous inmates. None of the prior Ninth Circuit decisions have offered any guidance on whether either of these proffered methods of distribution affect the scope of the publishers' and prisoners' First Amendment rights.

Overall, the facts of the instant matter do not squarely line up with the previous prison-mail cases that the Ninth Circuit or the Supreme Court have addressed. Here, Plaintiffs challenge Defendant Cogbill's refusal to deliver their unsolicited, non-subscription (*i.e.*, free) publication to inmates either by direct mail or through the bulk distribution method. Measuring these facts against Ninth Circuit precedent, because there is no convergence of interest in communicating between Plaintiffs and any particular inmate, Plaintiffs' purported First Amendment right to distribute their magazine is arguably weaker than the publisher's interest recognized in *Lehman*, *Cook*, and *Morrison*. Nevertheless, in the absence of authority indicating that a publisher's First Amendment interest in communicating with

---

publications, the court concluded that the defendant could have reasonably concluded that the policy directive was constitutional. *Id*. at 167. The court therefore reversed the trial court's denial of qualified immunity. The court then proceeded to assess the constitutionality of the policy directive under *Turner*. Reviewing the directive under each of the four factors, the court held that it was reasonably related to legitimate penological interests and therefore was not an unconstitutional violation of the plaintiff's First Amendment rights. *Id*. at 168-69.

Although the Sixth Circuit did not expressly address whether publishers have a right to send unsolicited junk mail to prisoners or whether prisoners have a right to receive such mail, by focusing its analysis on the *Turner* factors, the Sixth Circuit arguably presumed such a right exists. Thus, *Sheets* offers some support for Plaintiffs' contention that publishers have an implicit interest in reaching inmates with their unsolicited, bulk mailed publications.

inmates is contingent on an inmate first expressing an interest in receiving such information, the fact that *CJA* is unsolicited does not compel the conclusion that Plaintiffs, as publishers, lack any First Amendment interest in distributing their magazine. Accordingly, with the guidance that the Court can glean from the Ninth Circuit's precedent addressing publishers' rights to send mail to inmates, the Court assumes, without deciding, that Plaintiffs have a First Amendment interest in distributing their unsolicited, non-subscription publication to Sonoma County inmates. The question then becomes whether Defendant's refusal to accept and distribute *CJA* unlawfully infringes on that First Amendment right.

**B. Constitutionality of Defendant's Refusal to Deliver *CJA***

"[P]risoners' constitutional rights are subject to substantial limitations and restrictions in order to allow prison officials to achieve legitimate correctional goals and maintain institutional security." *Walker v. Sumner*, 917 F.2d 382, 385 (9th Cir. 1990) (internal citations omitted). In *Turner*, the Supreme Court articulated a four-part test for courts to apply when assessing the constitutionality of a prison regulation restricting an inmate's First Amendment rights: (1) whether the regulation is rationally related to a legitimate and neutral governmental objective; (2) whether there is an alternative means for the inmate to exercise the right; (3) the impact that accommodating the asserted right will have on guards and other prisoners, and on the allocation of prison resources; and (4) whether the absence of ready alternatives is evidence of the reasonableness of the regulation. 482 U.S. at 89-91. The Supreme Court has held that this test applies equally to publisher and sender. *PLN I*, 238 F.3d at 1149 (citing *Thornburgh*, 490 U.S. at 413). The first *Turner* factor is *sine qua non* of the test. *Morrison v. Hall*, 261 F.3d 896, 901 (9th Cir. 2001). Thus, if Defendant cannot demonstrate that his refusal to deliver *CJA* is rationally-related to a legitimate penological objective, the Court need not assess Defendant's decision under the other *Turner* factors. When engaging in this analysis, the Court is mindful that "considerable deference" is given to "the determinations of prison administrators who, in the in the interests of security, regulate the relations between prisoners and the outside world." *Thornburgh*, 490 U.S. at 408. Nevertheless, the *Turner* reasonableness standard "is not toothless" and does not require a court to rubber stamp all decisions by prison officials. *Id.* at 414.

**1. First *Turner* Factor: Is Defendant's Refusal to Deliver *CJA* Rationally-Related to a Legitimate Penological Objective?**

As indicated above, in evaluating the reasonableness of a regulation, the Court must first investigate whether there is a "valid, rational connection" between the contested regulation and the legitimate governmental interest proffered to justify it. *Turner*, 482 U.S. at 89. "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Id*. at 89-90. Furthermore, the proffered governmental objective must be both legitimate and neutral. *Id.* at 90. Accordingly, it is "important to inquire whether prison regulations restricting inmates' First Amendment rights operate in a neutral fashion, without regard to the content of the expression." *Id.* In assessing a regulation's neutrality, the Court only inquires as to whether "the regulation or practice in question [] further[s] an important or substantial governmental interest unrelated to the suppression of expression." *Thornburgh*, 490 U.S. at 415. Thus, the Supreme Court has held that regulations that distinguish between publications solely because of their potential implications for prison security, "are 'neutral' in the technical sense in which we meant and used that term in *Turner*." *Id.*

In his supporting Declaration, Plaintiff Hrdlicka indicates that CJA, Inc., "would be willing to accept any of the following methods to distribute *CJA* magazine in Sonoma County Jails: 1) direct mail 200 issues of the magazine to 200 different prisoners within 4 days of delivery; 2) bulk distribute 200 issues of the magazine per week; 3) distribute to all new inmates via the new inmate packet." (Hrdlicka Decl. (Doc. #64) at ¶93.) Defendant has refused to accept and deliver *CJA* under any of these methods. The Court must determine whether Defendant's refusal to deliver *CJA* to inmates at the Sonoma County jail's MADF facility is rationally related to legitimate penological objectives.

In his Cross-Motion, Defendant identifies the following penological objectives as the basis for his decision: (1) controlling the use and allocation of jail resources; (2) mail quantity control; (3) preventing unlawful business transactions and illegal solicitation; and (4) preventing disruption of the bail bondsmen posting agreement. (Costa Decl. at ¶ 11; JSOF at 5, ¶22(a)-(d).) Defendant's proffered justification thus fall into two general categories. The first two governmental objectives concern the effect of distributing *CJA* on jail administration and resources. The second two interests deal with the potential violation of the County's Inmate Mail Policy, California law, and the posting agreement

between the Sheriff's Department and North Bay Bail Agents Association. Because the first two interests are closely related, and as explained below, are case-dispositive, the Court focuses its analysis on these interests.

Defendant first asserts that his refusal to accept and distribute copies of *CJA* is directly connected to the Sonoma County jails' interests in conserving and managing resources. According to Defendant, expending the jails' limited resources to distribute unsolicited mail would constitute an inefficient use of limited jail resources to primarily benefit private businesses, namely Plaintiffs and their advertisers. By declining to distribute *CJA*, Defendant is able to prevent the jails from incurring additional operating expenses. In particular, Defendant proffers that a rising inmate population and a increase in incoming mail make it infeasible to accept hundreds of unsolicited magazines from Plaintiff. Defendant explains that between June 2004 and June 2005, the inmate population in the Sonoma County jails has increased 5%, with a corresponding increase in the amount of incoming mail. At the same time, however, Defendant states that the jails' budgetary resources and staff availability for processing inmate mail have not increased. As a result, Defendant submits that "[j]ail resource allocation issues have thus become even more critical than when the parties originally addressed the issues with this Court in July of 2004."

More specifically, Defendant advances that "Sonoma County jail officials previously determined that processing CJA's 300 pieces of unsolicited mail delivered on June 30, 2004, would have taken 5 ½ hours - more than the total time spent in processing all other mail received by the facility combined in a single day." (XMSJ at 16.) Based on the increase in jail population, Defendant contends that the time it would take to process Plaintiffs' 300 pieces of mail now exceeds its previous estimate. Further, Defendant contends that Plaintiffs' willingness to reduce the number of copies it seeks to deliver does little to alleviate the strain on resources. According to Defendant, delivery of 200 copies of *CJA* requires more than 3 2/3 hours to process each week, or 14.5 hours per month. With these figures as support, Defendant asserts that the processing time to deliver *CJA* to inmates "is certainly not *de minimis*, and constitutes an inefficient and ineffective use of jail resources[.]" (XMSJ at 17.)

In the same vein, Defendant asserts that the County has a legitimate interest in controlling the quantity of mail disseminated in the jails. Particularly, Defendant explains that, "[i]f he were to allow

CJA's mass mailing to be disseminated to individual jail inmates, then the quantity of such mail could dramatically increase, causing additional administration and staffing issues for the jail." (XMSJ at 17.) As a result, Defendant submits that, "[p]lacing greater burdens on mail processing staff also increases the likelihood that they could err, and miss contraband hidden in a piece of mail that would affect the safety and security of the jail as a whole."

In response, Plaintiffs concede that "the Sheriff has a legitimate interest in allocating jail resources." However, Plaintiff contend "that interest can be furthered only by restrictions that are not inconsistent with the mandates of [California Penal Code] § 2601(c)." (Pl. Reply at 17.) Plaintiffs also contend that Defendant's reliance on the Inmate Mail Policy is misplaced because, rather than adhering to the commercial/editorial distinction embodied in the definition of "unsolicited commercial mail," Defendant is impermissibly distinguishing between requested and unrequested magazines. Additionally, Plaintiffs argue that "[e]ven if the Sheriff's interest in resource allocation did justify some limitation on the number of copies of [*CJA*] that could be processed and delivered at one time, it does not justify a blanket refusal to deliver [*CJA*]."

After carefully considering the parties' competing arguments and the evidence proffered in support, the Court finds that Defendant's refusal to delivery *CJA* is rationally related to the County's legitimate penological interests. As indicated above, Plaintiff does not dispute the legitimacy of Defendant's proffered interests in resource allocation and mail quantity control. Because management of budgetary and staffing resources are significant concerns in the operation of penological facilities, the Court finds that Defendant's proffered interests in resource allocation and mail quantity control are legitimate governmental objectives. Furthermore, Defendant has indicated that the ultimate goal of managing prison resources and controlling the quantity of mail is to maintain the safety and security of the prison environment. As the Supreme Court has recognized, it is "beyond question" that protecting prison security - a purpose that is "central to all other corrections goals" - is a legitimate penological concern. *Thornburgh*, 490 U.S. at415 (quoting *Pell*, 417 U.S. at 823).

Having found that the Government has adequately identified legitimate objectives, the question then becomes: is there a valid, rational connection between Defendant's refusal to deliver *CJA* and these objectives? Reviewing the Declarations that Defendant has proffered in support, the Court finds this

United States District Court
For the Northern District of California

requirement met. As indicated above, based on a study conducted in 2004, Defendant avers that the MADF receives an average of 156 pieces of mail each day.[16] Based on Defendant's time study, accepting a weekly shipment of 300 issues of *CJA* would triple the amount of mail the jail typically receives in a single day, significantly increasing the 5 hours and 20 minutes MADF mail processors spend processing mail each day.[17] As Defendant explains, this additional administrative burden would have to be absorbed by the County jails without additional funding or staffing. Moreover, according to Defendant, the additional screening and processing duties increases the likelihood that the mail processing clerks will fail to detect contraband hidden in incoming mail, thereby affecting the overall safety and security of the jail.

The Court finds that Defendant has sufficient demonstrated that his refusal to distribute *CJA* is logically connected to and advanced these legitimate penological concerns. Specifically, the County's decision to refuse to accept and distribute unsolicited mail to inmates enables the County to conserve prison resources by limiting the amount of incoming mail that the prison staff must process. Further, by limiting the amount of incoming mail, the Sheriff's Department is able to keep the total amount of

---

[16]While Assistant Sheriff Costa states that, from June 2004 to June 2005, the number of inmates in Sonoma jail facilities has increased by approximately 5%, thereby "likely" resulting in a corresponding 5% increase in the amount of mail that the jail facilities receive, Defendant has proffered no evidence to validate this figure. In fact, Assistant Sheriff Costa admits that he "[has] not tested that assumption." (Coasta Decl. at ¶ 14.) Although the Court agrees that an increase in jail population is likely to precipitate an increase in the amount of incoming mail, based on the record before the Court, Assistant Sheriff Costa's statement that the Sonoma jail facilities have experienced 5% increase in incoming mail is speculative. The Court will therefore rely on the estimate Defendant proffers based on the July/August 2004 study, which have statistical support.

[17]In support of his statement that accepting 300 issues of *CJA* per week would substantially increase the amount of time MADF mail processors would have to dedicate to process and deliver those issues, Assistant Sheriff Costa cites a time study performed by Contra Costa County. According to Assistant Sheriff Costa, "the time study that Contra Costa performed is applicable and instructive to the Sonoma County jail." Particularly, he states that Contra Costa determined that it took an average of 1.11 minutes to process each copy of *CJA*. Using this number, Assistant Sheriff Costa opines that, "[b]ased on a delivery to Sonoma County jail of 300 *CJA* copies in a given day, the time to process and deliver those copies would be a total of 333 minutes, or approximately 5 ½ hours." Plaintiffs challenge Assistant Sheriff Costa's evaluation on the ground that there are institutional differences between the two Counties' facilities for which he does not account. As is the case with Defendant's evidence concerning the purported impact of the increase in inmate population, Defendant's statements about the increase in hours needed to process and distribute *CJA* is not based on an actual assessment of the Sonoma County jail facilities. Nevertheless, while the exact figure Defendant proffers may lack statistical support, the Court accepts Defendant's general supposition that increasing the amount of incoming mail will result in an increase in the hours dedicated to processing and distributing the additional materials.

United States District Court
For the Northern District of California

mail that must be processed to a manageable level, thereby ensuring its ability to adequately screen each piece and minimize security threats. *See Turner*, 482 U.S. at 93.

Nevertheless, Plaintiffs charge that Defendant's refusal to accept and distribute *CJA* fails to advance the County's interests because it contravenes California Penal Code § 2601(c), which provides in pertinent part that "each person in section 2600" shall have the right "[t]o purchase, receive, and read any and all newspapers, periodicals, and books accepted for distribution by the United States Post Office." Defendant opposes Plaintiffs' argument on the ground that § 2600 limits the protections afforded under § 2601(c) to "a person sentenced to imprisonment in a state prison." Notwithstanding the parties' disagreement over the applicability of §2601(c), the Court is unpersuaded by Plaintiffs' argument. Specifically, the Court fails to see how §2601(c) overrides or otherwise affects the rational relationship analysis under *Turner*. Nor does the Court find any of Plaintiffs' other challenges availing. While Plaintiffs contend that Defendants' interest in resource management and mail quantity control may justify some limitation on the number of copies of *CJA* that can be processed and delivered at one time, but not an outright ban, nothing in the first stage of the *Turner* analysis requires Defendants to demonstrate that their regulation is the least restrictive means of advancing their proffered penological objectives. Rather, at this stage, the Court must solely determine whether there is a logical connection between the regulation and the objectives. "[W]hen prison officials are able to demonstrate that they have rejected a less restrictive alternative because of reasonable founded fears that it will lead to greater harm, they succeed in demonstrating that the alternative they in fact selected was not an 'exaggerated response' under *Turner*." *Thornburgh*, 490 U.S. at 419. Here, the only figures before the Court are Plaintiffs' initial request that Defendant distribute 300 copies of *CJA*, and Plaintiffs' current request that Defendant distribute 200 copies of *CJA*. Defendant has put forth ample evidence demonstrating that even this reduced number will cause a appreciable impact on the jails' resources. Whether at some number less than 200 the impact on jail resources becomes *de minimis* cannot be determined based on the evidence currently before the Court.

Based on the foregoing analysis, the Court finds that Defendant's proffered objectives of conserving jail resources and controlling the quantity of incoming mail constitute legitimate penological objectives. Further, the Court finds that Defendant's refusal to accept and distribute *CJA*, whether by

United States District Court
For the Northern District of California

direct mail or the bulk distribution method, bears a valid, rational connection to these objectives. Finally, the Court finds that Defendant's restriction is neutral in its application, in that, the basis for the regulation under these justifications is based on the unsolicited nature of the materials and the Sheriff's Department's interest in maintaining a secure environment, as opposed to *CJA*'s content. *See Thornburgh*, 490 U.S. at 415-16. Taken together, the Court concludes that first *Turner* factor weighs in favor of Defendant.

**2. Second *Turner* Factor: Alternative Avenues for Plaintiff to Exercise Right**

Next, the Court must determine "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. The Supreme Court has advised that "'the right' in question must be viewed sensibly and expansively." *Thornburgh*, 490 U.S. at 417. For example, in *Turner*, which concerned regulation of inmate-to-inmate correspondence, the Supreme Court held that it was sufficient if other means of expression - not necessarily other means of communicating with inmates in other prisons - remained available. In instances where alternate avenues remain available, the Court is particularly mindful of the deference owed to correction officials in gauging the validity of the contested regulation. *Turner*, 482 U.S. at 90.

In its Cross-Motion, Defendant maintains that "[t]here are reasonable alternative avenues available to both the inmates and Plaintiffs to receive and send the material contained in *CJA*." (XMSJ at 25.) As to the inmates, Defendant contends that the Sonoma County jail provides inmates with access to the same resources found in *CJA*, including a general circulation library, a law library, a part-time paralegal, a list of bail bond licensees, and copies of bail bond ads from the yellow pages, on request. (*Id.*) Additionally, Defendant contends that inmates may request subscription publications be purchased through the Inmate Welfare Trust Fund.

With respect to Plaintiffs alternate avenues, Defendant contends that Plaintiffs would be able to send their publication to inmates if they created a "communicative unit - in which the inmate requests to receive information and the publisher responds." (*Id.*) Under this system, the inmate would request to receive a copy of *CJA* without any subscription price, and Plaintiffs would send their magazine to the inmate via mail. According to Defendant, "[i]n such a circumstance, [Plaintiffs] would not be required to remove the offending advertisements from [*CJA*], for they would no longer be *unsolicited*

United States District Court
For the Northern District of California

communications."[18] (*Id.*) Thus, Defendant concludes that Plaintiffs have a viable alternative to distribute their magazine to the Sonoma County inmates.

Plaintiffs, however, assert that the request-based distribution method is inadequate because: (1) it does not alleviate Defendant's concern that *CJA* contains bail agent advertisements that are addressed and mailed directly to inmates; and (2) "[because] no one is permitted to solicit an inmate for a business transaction, CJA, Inc., has no way of informing the inmates of the availability of [*CJA*] on a subscription basis." (Pl. Reply at 21.) Defendant contests both of these points. As to Plaintiffs' first challenge, Defendant responds that "distribution of *CJA* would not violate any policies, statutes, or regulations if it was first requested by an inmate." (XMSJ Reply at 16.) In response to Plaintiffs' second objection, Defendant submits that Plaintiffs may simply ask bail agents to inform inmates of the magazine, or advertise in the community and in other publications that they know are distributed or made available to inmates, such as *Prison Legal News*. Defendant also points out that *Prison Legal News* has successfully operated on a subscription-based system.

Considering the foregoing arguments, the Court agrees with Defendant that feasible alternatives exist for both Plaintiffs and the Sonona County inmates to exercise the First Amendment rights implicated in this matter. Although the inmates cannot receive the specific journalistic content of *CJA*, because the inmates have access to a wide-range of similar journalistic publications as well as lawful forms of bail bond advertisements, the inmates retain avenues to exercise their First Amendment right to receive the type of information contained in *CJA*.

Whether Plaintiffs have alternative means to distribute their publication to Sonoma County jail inmates presents a closer question. As detailed above, Defendant suggests that Plaintiffs simply have to implement a subscription-based distribution system to permissibly distribute their magazine to Sonoma County inmates. Plaintiff notes that this suggestion contradicts, or at least ignores, Defendant's other arguments regarding transacting business with inmates based on the advertisements in *CJA*. However, in its briefs Defendant has conceded that if an inmate requested *CJA*, distribution of the

[18]Defendant also proffers that this request-based distribution method would not be hampered by the shortness of an inmate's incarceration at the facility. Rather, Defendant argues that, during the 2004-2005 fiscal year, the average length of stay of a Sonoma County jail inmate was 41 days, which Defendant contends is enough time for the inmate to request and receive a copy of *CJA*. (XMSJ at 25-26.)

United States District Court
For the Northern District of California

magazine would not violate any of the County jails' policies or other state statutes or regulations. Thus, in light of Defendant's statement, there appears to be no legal bar to Plaintiffs employing a subscription-based system. Further, and perhaps more importantly, Plaintiffs have not demonstrated that a subscription-based system would be cost prohibitive. *See PLN I*, 238 F.3d at 1149. While relying on subscriptions may reduce the circulation rate of *CJA*, in that, only inmates who affirmatively request to receive the magazine would receive it, this method still effectively allows Plaintiffs to exercise their First Amendment right to communicate through their publication with the Sonoma County inmates. Indeed, nothing in the controlling constitutional jurisprudence requires that Plaintiffs be ensured a means to exercise their right that will give them the widest audience. Utilizing traditional advertising techniques and relying on word-of-mouth to promote their magazine and attract inmate subscribers to whom Plaintiffs may directly mail issues of *CJA* thus provides a sufficient alternate avenue for Plaintiffs to exercise their First Amendment right.

**3. Third *Turner* Factor: Impact that Accommodating the Asserted Right Will Have on the Allocation of Prison Resources**

Third, the Court considers "the impact accommodation of the asserted right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. As the Supreme Court observed, "[i]n the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order." *Id*. Thus, "[w]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.*

As discussed more fully above under the first *Turner* prong, accepting *CJA* for distribution in the Sonoma County jails will have a significant impact on the jails' resources and quantity of incoming mail that must be processed. Based on the Defendant's time study, the amount staffing power required to distribute 200 copies of *CJA* on a weekly basis when the jails receive, on average, 156 pieces daily is significantly more than that required to process the mail at issue in *PLN I* and *Clement*, both cases in which the Ninth Circuit discounted the correctional facilities' resource allocation argument. *PLN I*, 238 F.3d at 1151 (mail at issue made up only 15-30 pieces out of 5,000-8,000 processed daily); *Clement*, 364 F.3d at 1151 (mail at issue constituted, at most, 500 pieces out of 300,000 total pieces each month). In

United States District Court
For the Northern District of California

contrast, the court in *Alcala v. Calderon*, 1997 WL 446234, at *3, 5 (N.D. Cal. July 24, 1997), held that processing 300-400 pieces of "junk mail" daily would affect the prison, lead to increased processing time, and "overwhelm the mechanics of sorting, searching, and delivering the mail, increasing the likelihood of contraband entering the prison." While the weekly processing of 200 issues of *CJA* falls somewhere in between the permissible range of 15-30 pieces and the impermissible range of 300-400 pieces daily, the efforts that will be required to process 200 *CJA* magazines each week "would impose more than a *de minimis* cost on the pursuit of legitimate corrections goals." *Turner*, 482 U.S. at 93.

Defendant further contends that the bulk delivery method does not resolve its resource allocation or mail quantity control concerns for two reasons. First, according to Defendant, delivering *CJA* to inmates, whether individually-addressed or in bulk, opens up a Pandora's Box to other publishers seeking to access inmates. As noted in its Order denying Plaintiffs' Motion for a Preliminary Injunction, the Court is not persuaded by this argument. Second, Defendant reiterates his argument that the delivery of *CJA*, even in bulk, will incur more than *de minimis* costs (in terms of resource allocation) to the jails. While placing stacks of *CJA* in the common areas of the jails, and replenishing them when the stacks run low requires less staff time and fewer resources than the direct mail method of delivery, it nevertheless imposes an additional and significant burden on the jails' resources. Accordingly, the Court finds that Defendant has sufficiently shown that accommodating Plaintiffs' request to distribute *CJA* will significantly affect the jails' resources.

**4. Fourth *Turner* Factor: There are No Easy or Obvious Alternatives to Policy**

Finally, in *Turner* the Supreme Court instructed:

> [T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns . . . . But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Turner*, 482 U.S. at 90-91.

Plaintiffs assert that "all of the Sheriff's legitimate penological interests can be accommodated by employing the bulk distribution method of placing stacks of [*CJA*] in common areas and modules and replentishing them as necessary." In Plaintiffs' view, the bulk distribution method eliminates Defendant's concerns about mail quantity control and the administrative burden of placing a copy of

*CJA* in each inmate's mailbox. Plaintiff thus claims that "[t]he ready availability of this alternative makes manifest that [Defendant's] outright ban on [*CJA*] is an exaggerated response."

Defendant, however, contends that the bulk delivery method suffers from the same problems as the direct mail method. Specifically, Defendant proffers Assistant Sheriff Costa's statement that the only staff that would be available to accept delivery of the boxes of *CJA* and place them throughout the facility are the jail's internal courier staff. (Costa Decl. at ¶33.) Assistant Sheriff Costa avers that jail courier staff would have to cart boxes of *CJA* to each of the 20 inmate common areas to deliver and replenish the supply of magazines, which he characterizes as "an improper use of resources." (*Id.*) Assistant Sheriff Costa also points out that the jail prohibits any type of paper to be left in inmate common areas, and has never allowed any publication to be left in the common areas because of fire and security concerns.[19] (*Id.* at ¶34.) Thus, Assistant Sheriff Costa submits that "the tasks of bulk delivering copies of *CJA* to each of the 20 common areas, replenishing the copies as needed, ensuring that the copies are not used to thwart security in the jail, and picking up after the inmates to clear the clutter and reduce fire hazards" are not *de minimis* tasks and "would require expenditure of a not inconsequential amount of resources and supervision."[20] (*Id.* at ¶35.)

Considering the foregoing arguments and evidence, the Court agrees with Defendant that the bulk delivery method does not adequately alleviate the resource allocation and security concerns

---

[19]For example, Assistant Sheriff Costa states that inmates could hide gang communications inside copies of *CJA* that could be transferred to other inmates. (Costa Decl. at ¶34.) He also submits that correctional officers inside each module would have to pick up after the inmates who leave copies of *CJA* in the common areas "to make the unit tidy and clutter free, [as] required under the fire codes." (*Id.*) Interestingly, there is no evidence in the record as to why *CJA*, in comparison to any other inmate mail, would be more likely to be discarded or left behind, thus creating "clutter" or a fire hazard. *See PLN I*, 238 F.3d at 1150 (rejecting rational relation between regulation prohibiting personal subscription standard-rate mail, but not first class mail, and purported penological interest in reducing fire hazard); *Payne v. Whitmore*, 325 F. Supp. 1191, 1193 (C.D. Cal. 1971) (rejecting proffered explanation in support of rule banning inmates from receiving newspapers and periodicals that such materials are a fire hazard, noting that "[j]ails are already filled with an abundance of materials quite suitable for fire-starting[.]"); *see also Banks v. Beard*, 339 F.3d 134, 143-44 (3rd Cir. 2005) (rejecting district court's finding that a rational connection existed between inmate's possession of periodicals and photographs and fire hazard where record had no evidence to support such connection).

[20]Defendant also contends that allowing Plaintiffs to utilize the Sonoma County Jails' internal courier system to deliver copies of *CJA* to inmates would likely change the classification of the jails as a nonpublic fora to a designed public fora, thereby requiring Defendant to open up the system for wider use by other potential publishers. (XMSJ at 28.) Because the Court finds Defendant's argument with respect to resource allocation and security concerns dispositive, it expresses no opinion on this argument.

attendant to that method of distribution. Specifically, while the bulk delivery method may relieve the jails' mail staff of additional time spent placing individually-addressed copies of *CJA* in each inmate's mailbox, it imposes new responsibilities on the jails' courier staff and the correctional officers, who would be responsible for receiving, distributing, monitoring, and replenishing the supply of *CJA* in the jails' common areas. Thus, because these duties actually require continuous action on the part of jail staff, the bulk distribution method does little to overcome the resource allocation problem associated with the direct mail method of distribution. Moreover, as Defendant points out, the jails prohibit any type of paper to be left in the common areas. In light of this rule, it is unclear as to how *CJA* could be distributed in bulk in the jails. Taken together, the burden imposed on jail resources and the current rule preventing paper from being left in common areas lead the Court to conclude that Defendant's decision to reject the bulk delivery method is not an exaggerated response by Defendant.

**5. Summary of the *Turner* Analysis**

In sum, applying *Turner*'s analytical framework to assess the reasonableness of Defendant's regulation, the Court finds that Defendant's refusal to grant Plaintiffs' request to deliver copies of *CJA*, whether by direct mail or bulk delivery, is reasonably related to legitimate penological interests. There is a valid, rational connection between Defendant's refusal and the jails' interests in resource allocation and mail quantity control. Plaintiffs have viable alternate avenues to exercise their First Amendment right to communicate with the inmates through their publication, namely by employing a subscription-based method of distribution. Accommodating Plaintiffs' request would result in a significant increase in jail resources, whether born by the mail processing staff or the courier staff. Finally, there is no apparent alterative to the Defendant's decision that can be implemented without sacrificing the jails' proffered penological interests. Accordingly, the Court concludes that Defendant's refusal to deliver *CJA* is permissible under *Turner*.

**IV. CONCLUSION**

For the foregoing reasons, the Court **DENIES** Plaintiffs' Motion for Summary Judgment (Doc. #60), and **GRANTS** Defendant's Cross-Motion for Summary Judgment (Doc. #68).

**IT IS SO ORDERED.**

Dated: 9/1/2006

Martin J. Jenkins

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE